**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: _9/29/23_____

**TEACHERS INSURANCE AND ANNNUITY**
**ASSOCATION OF AMERICA,**

**Plaintiff,**

-against-

**SIMONS,**

**Defendant.**

**21-cv-03712-ALC**

<u>**OPINION AND ORDER**</u>

**ANDREW L. CARTER, United States District Judge:**

Plaintiff Teachers Insurance and Annuity Association of America ("TIAA" or "Plaintiff")
brings this action against Melanie Simons ("Simons" or "Defendant"), a former employee at
TIAA, alleging breach of contract. The breach of contract claim stems from Plaintiff's allegation
that Simons solicited three former wealth management advisors to leave TIAA, in violation of her
post-employment non-solicitation covenant.

Pending before the Court is (i) Defendant's motion for summary judgment; (ii) Plaintiff's
motion for summary judgment; and (iii) Defendant's motion for sanctions pursuant to Federal Rule
of Civil Procedure 11. Defendant's motion for sanction is **DENIED**. Defendant's motion for
summary judgment is **DENIED**, and Plaintiff's motion for summary judgment is **DENIED**.

**BACKGROUND**

I.   **Factual Background**[1]

---

[1] Except as otherwise noted, the following background derives from the undisputed facts as set forth by the
parties in their Local Rule 56.1 Statements of Undisputed Material Facts and responses thereto. These
include: Plaintiff's Rule 56.1 Statement of Undisputed Material Facts, ECF No. 68-2; Defendant's Rule
56.1 Statement of Undisputed Material Facts, ECF No. 69-2; Plaintiff's Response to Defendant's Rule 56.1
Statement, ECF No. 72; Defendants' Response to Plaintiff's Rule 56.1 Statement ECF No. 71-1; and
Defendant's Supplemental Rule 56.1 Statement, ECF No. 71-1. The Court has also considered the full
record submitted by the parties, including the following declarations and accompanying exhibits: the
Declaration of Melanie Simons ("Simons Decl."), ECF No. 69-4; the Declaration of Mitchell Falter ("Falter

Defendant Simons was formerly employed as a "wealth management director" by Plaintiff TIAA. SUMF ¶¶ 1, 90.[2] As a wealth management director, Simons' responsibilities were primarily managerial and supervisory, and she managed between five and ten clients at any given time. SUMF ¶ 2, Simons Decl. ¶ 5. TIAA provided Defendant with a host of benefits throughout her employment, including the ability to earn a very substantial income. SUMF ¶ 91.

Mitchell Falter ("Falter"), Jessica Doll ("Doll"), and Thomas Massie ("Massie") are former TIAA "wealth management advisors" whom Simons supervised, along with approximately 35 other direct reports. SUMF ¶¶ 3, 111. In or around February 2020, at a happy hour, Massie, Falter,

---

Decl."), ECF No. 69-6; the Declaration of Jessie Doll ("Doll Decl."), ECF No. 69-7; the Declaration of Thomas Massie ("Massie Decl."), ECF No. 69-8; the Deposition Transcript of Melanie Simons ("Simons Dep."), ECF No. 68-3, 69-9, and 75-1; the Deposition Transcript of Thomas Massie ("Massie Dep."), ECF Nos. 68-8, 69-10, and 71-5; the Deposition Transcript of Jessie Doll ("Doll Dep."), ECF Nos. 68-6, 69-11, 71-3; the Deposition Transcript of Mitchell Falter ("Falter Dep."), ECF Nos. 68-5, 69-12, and 71-6; the Diamond Consulting Emails, ECF No. 69-13; the Voluntary Separation Program Agreement ("VSP Agreement"), ECF Nos. 68-3, 69-14; the emails from Simons pursuing employment with Mercer Advisor, ECF No. 69-15; an email from Melanie Simons to Mariner Wealth/Mariner Platform Solutions ("Mariner"), dated November 16, 2020, ECF No. 69-17; an email from Mariner to Melanie Simons, dated November 16, 2020, ECF No. 69-18; the ReFrame Wealth EIN Application, ECF No. 69-19; the Jessie Doll Employment Agreement, ECF No. 69-20; the Thomas Massie Employment Agreement, ECF No. 69-21; the Mitchell Falter Employment Agreement, ECF No. 69-22; Plaintiff's Responses to Defendant's Requests for Admission, ECF No. 69-5; Defendant's Responses to Plaintiff's Interrogatories, ECF No. 69-16; Plaintiff's Responses to Defendant's Interrogatories, ECF No. 69-23; Defendant's Response to Plaintiff's Requests for Admission, ECF No. 68-7; and the Supplemental Declaration of Melanie Simons ("Suppl. Simons Decl."), ECF No. 71-4. No further citations to the record will be made herein except as specifically cited. Citations to the parties' 56.1 statements incorporate the evidentiary materials cited therein. Unless otherwise noted, where the parties' Rule 56.1 statement is cited, that fact is undisputed or the opposing party has not pointed to any evidence in the record to contradict it. *See* Local Civil Rule 56.1(c), (d). The Court construes any disputed facts discussed in this section and the justifiable inferences arising therefrom in the light most favorable to the non-movant for each motion, as required under the summary judgment standard as set forth in this opinion.

[2] Both parties submitted Rule 56.1 statements of undisputed material facts and counter-statements. *See* ECF Nos. 68-2, 69-2, 71-1, 72. For ease of reference, the Court refers to ECF Nos. 68-2, 69-2, 71-1 and 72 as "SUMF." Any specific citation to the Plaintiff's Rule 56.1 Statement shall be referred to as "Pl.'s SUMF" and any specific citation to the Defendant's Rule 56.1 Statement shall be referred to as "Def.'s SUMF."

and Doll met and began discussing pursuing professional opportunities outside of TIAA.[3] SUMF ¶ 4; Massie Dep. at 81:9-82:14; Doll Dep. at 63:25-64:25. Simons was not present or invited to this meeting, nor was she in any way involved in these discussions. SUMF ¶ 5. In March 2020, Massie decided that he would resign from TIAA because the number of clients for which he was responsible had become unsustainable, and he had always hoped to open and run his own wealth management firm. *Id*. ¶ 6; Massie Dep. at 22:20-22, 27:14-28:7. Falter, Doll, and Massie did not inform Simons that they were considering other professional opportunities outside of TIAA because they were not considering working with Simons when they left TIAA. SUMF ¶ 7.

In May 2020, TIAA informed its employees that it was initiating a company-wide Voluntary Separation Program ("VSP"). *Id*. ¶¶ 8, 92. TIAA offered the VSP to about 75% of its workforce, including Simons, Doll, and Massie. *Id*. ¶ 9. TIAA engaged in a three-month-long campaign designed to induce eligible employees electing to participate in the VSP. *Id*. ¶ 11. As part of this campaign, TIAA instructed directors—including Defendant Simons—to encourage eligible employees under their supervision to consider participating in the VSP. *Id*. ¶ 12. TIAA encouraged all employees who had been offered the VSP, including Simons, Doll, and Massie, to consider both internal and external employment options. *Id*. ¶ 13.

Following TIAA's announcement initiating the VSP in May 2020, Falter, Doll, and Massie began discussing amongst themselves tangible steps that they needed to take to leave TIAA and create their own company. *Id*. ¶ 14. Falter, Doll, and Massie met with vendors and other potential

---

[3] Defendant explains that the three began discussing the idea of creating their own firm. Def.'s SUMF ¶ 4. Plaintiff disputes this characterization based on the deposition transcript of Doll. Pl.'s Resp. to Def.'s SUMF ¶ 4.

business partners to help them in formation of their new company.[4] *Id*. ¶ 15; Falter Dep. 58:15-61:12; Doll Dep. 43:9-47:8; Massie Dep. 20:20-21:8, 34:12-20, 35:21-36:11, 85:15-86:12. In May 2020, Falter, Doll, and Massie met with Louis Diamond of Diamond Consultants, a hiring/placement manager for financial advisors who want to become independent, to discuss forming a wealth management company.[5] SUMF ¶ 16; Massie Dep. 86:1-8; Doll Dep. 68:3-69:2; Diamond Consulting Emails, ECF No. 69-13. As part of their work with Diamond Consultants, Doll and Massie completed personality assessments in May 2020; Massie wrote that "in 5 years, I envision myself working with my partners at a firm we created ourselves." SUMF ¶¶ 17, 20; Diamond Consulting Emails at 12.[6] Massie testified that he was not referring to Defendant Simons when he referenced his envisioning of "partners at a firm we created ourselves." SUMF ¶ 21. Defendant Simons did not meet with Diamond Consultants in May 2020, or at any other time prior to November 2020, because she was not aware of or involved in their planning of their venture at that point in time. *Id*. ¶ 22.

Prior to May 2020, Falter already had contacts at Raymond James Financial, Inc. because he previously had met with company representatives to discuss future opportunities for himself. *Id* ¶ 23. During the Spring or Summer of 2020, Falter arranged a Zoom meeting with him, Doll, Massie, and a Raymond James local district manager about the possibility of potential employment or a future partnership with Raymond James. *Id*. ¶ 24; Falter Dep. at 58:15-59:11; Doll Dep. at

---

[4] Plaintiff disputes Defendant's characterization that "they put these plans into action." Pl.'s Resp. to Def.'s SUMF ¶ 15.

[5] Plaintiff disputes Defendant's characterization that they met "to discuss their plan to form their own management company." Pl.'s Resp. to Def.'s SUMF ¶ 16. But in the Doll Deposition, Doll was asked "when you say 'those discussions,' the discussions with Mr. Massie and Mr. Falter and yourself about forming a wealth management company?" and Doll responded "Yeah." Doll Dep. at 68:21-25.

[6] All pagination cites to this Exhibit refer to the pagination provided by the ECF system.

43:9-18, 45:4-6; Massie Dep. at 32:11-33:12.  Defendant Simons was not involved in any of those discussions with Raymond James. SUMF ¶ 25.  In August or September 2020, Massie contacted a representative for independent registered advisory firms at Charles Schwab about the formation process of the new company being formed by him, Falter, and Doll. *Id.* ¶ 26. In or around October 2020, Massie, Falter, and Doll began meetings and discussions with Mariner Wealth/Mariner Platform solutions ("Mariner"), a company that provides office support, investment solutions, and compliance assistance for independent financial planning firms like the one that Falter, Doll, and Massie were planning. *Id*. ¶ 27. Simons was not involved in any of those meetings with Charles Schwab or Mariner. *Id*. ¶ 28.

Falter, Doll, and Massie met with at least four other vendors in the Summer and early Fall of 2020 (prior to Simons' separation of employment on November 2, 2020) to assist with the formation of their new company, including Stratos Wealth, Summit Financial, Commonwealth Financial, and Goss Financial Advisors, and Defendant Simons was completely unaware of and uninvolved in each of those meetings. *Id*. ¶¶ 29–30. Additionally, Massie introduced Falter and Doll to his friend Tony Thur, who works in commercial real estate, and Thur helped them locate office space.  *Id*. ¶ 31. Massie was also "part of conversations" related to finding a local bank for their new company's business accounts, participated in marketing meetings, and contributed to conversations pertaining to finding back-office support, and an investment platform. *Id*. ¶ 32; Massie Dep. at 16:18-17:6. During the Spring and Summer of 2020, Falter, Doll, and Massie did not have any discussions with Simons about leaving TIAA or even consider involving her in any such discussions because (i) Simons was their supervisor; (ii) they did not believe Simons was planning to leave TIAA or would be interested in doing so; and (iii) she was a manager and not in a financial planning role like them. SUMF ¶ 33.

On July 1, 2020, Simons participated in an organizational leadership teleconference where TIAA announced that its wealth management business would merge with its institutional relations business, and as a result, several categories of leadership roles, including Simons' role, would be eliminated nationwide. *Id*. ¶ 34. Later that day, Simons participated in a regional conference call in which she and her peers were told by her manager that because the Wealth Management Director role had been eliminated nationwide, they would need to apply for new roles if they wished to stay employed by TIAA. *Id*. ¶¶ 35, 93. Following TIAA's announcement that it was eliminating her position, Simons applied for an open position as Managing Director for the DC Region, and TIAA subsequently rejected Simons' application for that position. *Id*. ¶¶ 36-37. This position would have involved a pay raise over her prior wealth management director position. *Id*. ¶ 94. According to TIAA, there were a number of newly-created Senior Director roles throughout the country that Defendant chose not to pursue. *Id*. ¶ 95. Simons explains that she did not apply for any other internal roles because she was encouraged to accept the voluntary separation package and any other such role would have been a financial demotion. *Id*. ¶ 38.[7]

On July 10, 2020, Simons elected to participate in the VSP because TIAA eliminated her role. *Id*. ¶¶ 39, 96. TIAA never replaced Simons' position of Senior Wealth Management Director. *Id*. ¶ 43.

In connection with the VSP, Simons was required to sign an agreement upon termination providing her with specific benefits in exchange for, among other things, a full release of claims

---

[7] The Plaintiff disputes that any other roles Simons could have applied for would have resulted in less compensation. Pl.'s Resp. to Def.'s SUMF, ECF No. 72. However, in their response to the factual assertion in Defendant's Rule 56.1 Statement, Plaintiff fails to point to a factual dispute on this issue in the underlying record.

against TIAA and an agreement not to solicit TIAA employees ("VSP Agreement"). *Id*. ¶ 40. In exchange for consideration in excess of $500,000, Defendant promised to follow the VSP Agreement. *Id*. ¶¶ 97, 103.The VSP Agreement not to solicit TIAA employees stated:

> You also agree that for a period of twenty-four (24) months from your Resignation Date: (A) you will not solicit, recruit, induce, urge, or encourage, or attempt to solicit, recruit, induce, urge, or encourage, any employee . . . to terminate, cancel, withdraw or reduce its relationship with TIAA…

*Id*. ¶¶ 41, 97; VSP Agreement, ECF No. 69-14 ¶ (8)(b)(ii)(A). The VSP Agreement also contained a confidentiality provision and covenant not to solicit TIAA clients. *Id*. ¶ 98. The VSP Agreement stated that for two years following the termination of her employment to:

> not solicit, divert, take away, or attempt to solicit, divert, or take away (through any form of contact or communication whether or not initiated by you for such purpose) any Client, with whom or which you had Material Contact, for the purpose of having such Client terminate, cancel, withdraw, reduce, diminish, or limit, in any manner, the Client's relationship with TIAA.

SUMF ¶ 99; VSP Agreement ¶ (8)(b)(ii)(C). The VSP Agreement defines Material Contact to include "supervising or coordinating the Client's business dealings with TIAA." SUMF ¶ 100; VSP Agreement ¶ (8)(a)(iii). Under the VSP Agreement TIAA is entitled to seek a variety of legal damages including "the recovery of money damages." SUMF ¶ 102. VSP Agreement ¶ 11.

Simons signed a similar agreement not to solicit employees in 2015. *Id*. ¶¶ 42, 106. Following TIAA's rejection of Simons' application for the DC Managing Director role and her acceptance of the VSP, Simons began actively pursuing and scheduling interviews for job opportunities with other financial industry firms, including Mercer Advisors ("Mercer"), Vanguard, Verdence Wealth Management, and Raymond James. *Id*. ¶ 44. From August to mid-November 2020, Simons had multiple rounds of interviews and meetings with Mercer to become a Regional Director, including meeting with their Chief Executive Officer, Chief Investment

Officer, and Head of Client Services. *Id.* ¶ 45. Pursuant to the VSP, Simons' employment with TIAA terminated on November 2, 2020. VSP Agreement at 1. At that time, Simons was unaware that Falter, Doll, and Massie had taken steps to form or had even been considering forming their own venture together. SUMF ¶ 47.

While Simons was on vacation on November 9, 2020, upon receiving word that Falter's father had suffered from a stroke, Simons called Falter with the intention to inquire about his father's health and express her sympathy. *Id.* ¶¶ 48, 113; Simons Dep. at 35:4-37:4; Falter Dep. at 24:4-20. Falter then returned Simons' call and, after they had finished discussing his father's health, he told her that he, Doll, and Massie had already begun taking steps to form a new financial planning business, but that there "was something missing from [their] potential venture and the skills that we could bring to the table." Falter Dep. at 24:4-20; Simons Dep. at 36:18-40:10; Simons Decl. ¶ 21. Essentially, it was determined that Simons had "certain skills" that Falter, Doll, and Massie all lacked. SUMF ¶ 134; Simons Dep. at 102:4-18.

As a result of Simons' expertise in the areas of marketing and managerial experience, Falter asked Simons if she would be interested in speaking further with him, Doll, and Massie about the opportunity to join them in the formation of their new venture when she returned from vacation. SUMF ¶ 50. Falter, Doll, and Massie had discussed amongst themselves the possibility of offering Simons the role of CEO of their new company and had all agreed that if Simons decided to join them, she should be given the title of CEO because of her superior managerial, marketing, administrative, and operational skills. *Id.* ¶ 51. They felt that Simons was good at managing people, interacting with vendors, being organized, and could add a lot of value to their company by taking on those roles, while allowing each of them to focus solely on financial planning. *Id.* ¶ 52.

As a follow up to Falter's invitation during their initial phone call, Simons met with Falter and Doll at Doll's house within a week of November 9, 2020. Falter Dep. at 61:13-24; Doll Dep. at 47:14-48:8; Simons Dep. at 43:20-44:2; 101:3-102:3. Falter and Doll used the meeting to educate Simons about the business opportunity and encourage, recruit, and advocate for her to join them. Falter Dep. at 46:5- 47:2, 62:8-20; Simons Dep. at 102:4-104:25. Specifically, Falter and Doll walked Simons through the preparations that he, Doll and Massie had made so far and how they envisioned Simons fitting in to the company they had already begun taking steps to form. Simons Dep. at 103:10-104:25; Doll Dep. at 48:14-18 Falter Dep. 25:19-26:5.  Falter and Doll filled Simons in on each of the vendors and platforms they had explored and the reasons why they eventually chose to forego other companies and work with Mariner, including that their retained counsel was in the midst of conversations with Mariner's legal team about a potential agreement regarding the cost structure of their partnership and access to resources. Def.'s Responses to Plaintiff's Interrogatories, ¶ 4; Simons Dep. at 103:10-104:25. The parties do dispute one aspect of this conversation. Defendant asserts that Falter and Doll also explained to Simons that they had discussed a compensation plan, and that it was their expectation to lease office space and eventually hire support staff.  Def.'s Responses to Plaintiff's Interrogatories, ¶ 4. Plaintiff, citing the deposition of Simons, disputes they discussed this. Pl.'s Resp. to Def.'s SUMF ¶ 57.

Falter and Doll additionally told Simons that if she chose to join them and Massie in their venture, they would give her the title of CEO for two reasons; first, she had the supervisory skills that the three of them did not have, and they believed that it would be a good use of her abilities, especially since the three of them wanted to focus solely on financial planning as opposed to managerial, marketing, or operational tasks. SUMF ¶ 58. Second, Falter, Doll, and Massie thought it was important to have a woman as a CEO because that would open a lot of doors for the business,

especially relating to networking in the community; that was an important reason why they thought that Simons' title should be CEO as opposed to COO, the title that Simons thought would have made the most sense based on their description of the role. Simons Dep. at 102:19-103:5, 112:3-8. Although Simons thought the title of CEO sounded "very big" at that time, based on the business development reasons that Falter, Doll, and Massie had outlined for giving her the CEO title, she agreed that it made sense for her. SUMF ¶ 60. Based on the information Simons learned during the meeting at Doll's house, it was clear to her that Falter, Doll, and Massie had done a lot of homework and had a path to success; thus Simons knew this was the right fit for her next career move. *Id.* ¶ 61. Even though Simons was in the late stages of her interview process for potential employment with Mercer, she decided to withdraw her name from consideration with Mercer and accept the offer to join Falter, Doll, and Massie in their new business venture. *Id.* ¶ 62.

On November 16, 2020, Simons emailed representatives from Mariner and stated: "I have recently accepted the opportunity to join [Falter, Doll, and Massie] in their launch of their independent firm in the coming year and look forward to that partnership with Mariner. I have also separated from TIAA and plan to use the next several months to prepare for launch, so I would greatly value your insights and suggestions." *Id.* ¶ 63. Later that day, a Mariner representative responded to Simons' email and stated: "[I]t's great to meet your acquaintance virtually and welcome you to the team! Thank you for reaching out, we'd be grateful for some time to connect live to help you get caught up as we and our teams continue to be of service to each other." *Id.* ¶ 64. On November 18, 2020, Simons notified Mercer Advisors via email that she was withdrawing

10

her candidacy for employment in favor of "electing to explore a more independent and entrepreneurial route for [her] next role in [their] great industry." *Id*. ¶ 65.[8]

Following her decision to work with Falter, Doll, and Massie as CEO of their new company in mid-November, Simons began to work with Falter, Doll, and Massie on matters such as identifying office space, and taking organizational steps relating to the company's name, brand, and website. SUMF ¶ 66; Simons Dep. at 45:15-46:7, 47:4-15, 49:13-50:9, 53:20-54:14. Through early 2021, Simons helped organize and prepare the new company, which they eventually named ReFrame Wealth, as Falter, Doll, and Massie were still employed by TIAA and had less time to focus on organizational tasks for their new company. SUMF ¶ 67. In her deposition, Defendant Simons explained that she was responsible for "identifying just about anything that needed to happen in order to get the business started." *Id*. ¶ 123; Simons Dep. at 58:9-14. Between November 2, 2020, when she signed the VSP Agreement, and February 26, 2021, the day Falter, Doll, and Massie resigned, Defendant communicated with Doll on over 10 occasions about forming ReFrame. SUMF ¶ 120. During this same timeframe, Defendant communicated with Falter on multiple occasions about forming ReFrame, and she also had communications with Massie. *Id*. ¶¶ 121–122.

In January 2021, Defendant arranged a meeting for her, Falter, Doll, and Massie with "Capital Directions," the entity chosen to conduct investment management for ReFrame. *Id*. ¶ 66-67. On January 19, 2021, Defendant Simons emailed Falter, Doll, and Massie a "To Do List" setting forth certain tasks they needed to do to launch an entity competitive to TIAA, including

---

[8] Defendant cites to an email sent by Simons to Mercer on November 18, 2020, but Defendant has not included this email as an exhibit. *See* Def.'s SUMF ¶ 65 (citing document stamped as MS000134). Plaintiff admitted this factual assertion and therefore the Court finds no dispute here.

selecting a company name and office address. *Id*. ¶ 125. On January 22, 2021, Defendant sent Falter, Doll, and Massie an email with nine separate names to consider for their soon-to-be formed entity. *Id*. ¶ 126. Defendant Simons communicated with the leasing agent about space for the potential new venture and, on February 4, 2021, Defendant toured office space along with Falter, Doll, and Massie. *Id*. ¶ 127. Defendant also reached out to another vendor, "Model FA [Financial Advisor] Consulting," about brand development and web design. *Id*. ¶ 128. On February 10, 2021, Model FA Consulting emailed Defendant a proposed agreement and, in turn, Defendant emailed Falter, Doll, and Massie the proposed agreement to solicit their "feedback." *Id*. ¶ 129. On February 23, 2021, Defendant communicated with Model FA Consulting in regard to an internet domain for ReFrame. *Id*. ¶ 130. On February 24, 2021, Defendant provided Falter, Doll, and Massie with a contractor agreement to sign with "Advisor Assist," an entity providing, among other services, compliance guidance. *Id*. ¶ 131.

Then, Falter, Doll, and Massie gave notice of their resignations from TIAA on February 26, 2021, the day after receiving their bonuses, as did numerous other TIAA employees.[9] *Id*. ¶¶ 68, 111. The parties dispute when Doll and Falter made their "final choice as to whether to stay at TIAA or resign." Pl.'s SUMF ¶¶ 116–117. According to Plaintiff, they did not make their "conclusive decision to resign until February 26, 2021." *Id*. According to Defendant, they both "began making plans to resign from TIAA as early as May 2020. Def.'s Resp. to Pl.'s SUMF ¶¶ 116–117.

---

[9] The parties dispute whether Falter, Doll, and Massie were "valuable TIAA employees." Pl.'s SUMF ¶ 112. Defendant denies this characterization because "TIAA encouraged Doll and Massie to accept the VSP demonstrating they were not valuable TIAA employees" and all three were "at-will employees." Def.'s Resp. to Pl.'s SUMF ¶ 112.

Falter, Doll, and Massie had no offers from any TIAA competitors as of November 2020 or February 2021. *Id*. ¶ 133. It was important for Falter, Doll, and Massie to receive their bonuses before they resigned and thus, they specifically made the decision to give notice of their resignations on February 26, 2021, so that they would be guaranteed to receive their bonus. *Id*. ¶ 69.

ReFrame Wealth was formed on or about March 2, 2021. *Id*. ¶ 70. At its inception, Simons became the CEO of ReFrame. *Id*. ¶ 140. During their 30-day notice periods, when Falter, Doll, and Massie continued to be TIAA employees and be compensated by the company, Defendant Simons submitted the paperwork necessary to incorporate ReFrame and she obtained the IRS Employer Identification Number for ReFrame. *Id*. ¶ 136. Falter's home address was used as ReFrame Wealth's address in its application for an Employer Identification Number ("EIN") to the IRS. *Id*. ¶ 73. ReFrame's Operating Agreement also reflects that the company was "duly organized by Melanie Simons by filing Articles of Incorporation." SUMF ¶ 137.  Simons also coordinated the SEC filing for ReFrame. *Id*.  ¶ 138. Falter, Doll, Massie, and Simons determined that Falter should have the largest ownership percentage in ReFrame Wealth because he had the most experience in the industry and the most highly marketable skills. *Id*. ¶ 71. Falter had approximately two times the amount of ownership percentage of ReFrame Wealth as Simons and Doll, and nearly four times as much as Massie. *Id*. ¶ 72. Falter signed Simons', Doll's, and Massie's employment agreements with ReFrame Wealth on behalf of ReFrame Wealth, and Doll signed Falter's employment agreement with ReFrame Wealth on behalf of ReFrame Wealth.  *Id*. ¶¶ 74-75.

On March 30, 2021, TIAA discovered that Falter, Doll, and Massie had joined ReFrame Wealth as co-founders along with Simons. *Id*. ¶ 76.  On April 1, 2021, instead of asking Falter,

13

Doll, or Massie, TIAA sent a letter to Simons demanding a "satisfactory explanation" from her as to the reasons for the resignations of Falter, Doll, and Massie from TIAA. *Id*. ¶¶ 77, 141. On April 2, 2021, Simons' attorney responded to TIAA's letter questioning the enforceability of Simons' non-solicitation covenants and explaining that Simons did not solicit any TIAA employees and that Falter, Doll, and Massie "each independently made the choice to resign from TIAA on their own accord without any input or suggestion from Simons." *Id*. ¶¶ 78, 142.[10] On April 5, 2021, TIAA again demanded that, within 24 hours, Simons provide a satisfactory explanation for the departures of Falter, Doll, and Massie from TIAA and insisted that she provide: (i) specific facts leading up to Falter's, Doll's and Massie's resignations from TIAA; (ii) details regarding all communications between Simons, on the one hand, and Falter, Doll, or Massie, on the other hand, from her termination date on November 2, 2020 through February 26, 2021; and (iii) all emails, texts, and other documentation reflecting these communications. *Id*. ¶¶ 79, 143. In the letter, TIAA explained that it had a contractual right to conduct expedited discovery without an order from the Court and that TIAA believed Defendant had reached out to Falter in November 2020. Pl.'s Resp. to Def.'s SUMF ¶ 78.

On April 9, 2020, Simons' attorney sent a response letter to TIAA in which, among other things, he described TIAA's requests for all emails, texts, and other documentation reflecting communications between Simons and Falter, Doll, and Massie as "excessive" and "unreasonable" and declined to provide TIAA with Simons' personal emails, texts, or other communications. SUMF ¶ 80. In support of TIAA's breach of contract claim and motion for a preliminary injunction,

---

[10] TIAA argues that Defendant's explanation in her letter response was conclusory in nature. Pl.'s Resp. to Def.'s SUMF ¶ 78.

Simons' second-level manager at TIAA, Jill Popovich, stated in her sworn declaration that she "can only conclude that these emails and texts reveal that Simons violated her non-solicitation covenant." SUMF ¶ 81; Decl. of Jill Popovich, ECF No. No. 8 ¶ 25.

According to Plaintiff, in May or June 2021, Simons asked Massie if there were any "announcement" phone calls he could make to TIAA clients, and that Massie subsequently made phone calls to multiple TIAA clients. Pl.'s SUMF ¶¶ 149, 152. Defendant disputes Plaintiff's characterization here. Defendant contends that Simons performed the role of Chief Compliance Officer in addition to her role as CEO and that Simons' question to Mr. Massie was whether, purely from a compliance perspective, he was legally allowed to make any type of calls informing the public that he no longer worked for TIAA. Suppl. Simons Decl. ¶¶ 1,2, 5. Simons contends that she never encouraged or suggested that he contact any clients or employees. *Id*. ¶ 8. In his deposition, Massie explained that he made five or six announcement calls to clients he formally serviced at TIAA, Massie Dep. at 72:3-13, and Defendant contends that none of those calls resulted in clients leaving TIAA for ReFrame Wealth. *See* Def.'s Suppl. SUMF ¶ 161.

In both his sworn declaration and in his deposition, Falter stated that: (i) he was not contacted or solicited by Simons to resign from TIAA or to join ReFrame Wealth, Falter Decl. ¶ 2; Ex. 9, Falter Dep. at 65:1-11; (ii) the decision to resign from TIAA in February 2021 was his and his alone, Falter Decl. ¶ 5, Falter Dep. at 66:14-22; (iii) Simons did not encourage, persuade, or otherwise influence his decision to resign from TIAA, Falter Decl. ¶ 5, Falter Dep. at 67:23-68:3; (iv) he would have resigned from TIAA in February of 2021 even if he had had no discussions with Simons after she separated from TIAA, and her eventual involvement with the joint venture did not influence his decision to leave TIAA, Falter Decl. ¶ 6, Falter Dep. at 62:21-63:8, 68:6-14; and (v) on November 9, 2020, he shared with Simons the opportunity to partner with

Doll, Massie, and him in a new financial planning business to be founded in the future after he resigned from TIAA. Falter Decl. ¶ 3; Falter Dep. at 65:12-23.

In both her sworn declaration and her deposition, Doll stated that: (i) she was not contacted or solicited by Simons resign from TIAA, Doll Decl. ¶ 2, Doll Dep. at 80:18-81:10); (ii) the decision to resign from TIAA in February 2021 was hers and hers alone and Simons did not encourage, persuade, or otherwise influence her decision in any way to resign from her employment with TIAA, Doll Decl. ¶ 4; Doll Dep. at 83:9-15; (iii) she would have resigned from TIAA in February 2021 even if she had had no discussions with Simons after she separated from TIAA, Doll Decl. ¶ 5, Doll Dep. at 83:16-23; and (iv) none of her conversations with Simons from November 2, 2020 to February 26, 2021, influenced her decision to resign from TIAA, Doll Dep. at 88:4-88:12.

In both his sworn declaration and his deposition, Massie stated that: (i) he was not contacted or solicited by Simons to resign from TIAA, Massie Decl. ¶ 2, Massie Dep. at 100:7-19; (ii) the decision to resign from TIAA in February 2021 was his and his alone and Simons did not encourage, persuade, or otherwise influence his decision in any way to resign from his employment with TIAA, Massie Decl. ¶ 4, Massie Dep. at 102:1-7; and (iii) he would have resigned from TIAA in February 2021 even if he had no discussions with Simons after she separated from TIAA. Massie Decl. ¶ 5; Massie Dep. at 102:17-25.

No current or former TIAA employee has ever communicated to TIAA that Simons solicited them to resign from TIAA. SUMF ¶ 85. TIAA admits that it has no facts showing that Simons disclosed TIAA's confidential information or trade secrets to third parties during or after her employment with TIAA. *Id*. ¶ 86. TIAA further admits that it is not its contention that Simons possessed confidential information or trade secrets following her employment with TIAA. *Id*. ¶ 87.

16

TIAA did not identify any facts demonstrating any communications where in Simons communicated with Falter, Doll, or Massie about starting a new venture before November 9, 2020. *Id*. ¶ 89.

## II.    Procedural Background

TIAA filed its complaint against Defendant on April 27, 2021. Compl., ECF No. 1. The next day, Plaintiff moved for a preliminary injunction enjoining Defendant Simons from violating her non-solicitation obligations as defined in the VSP Agreement. ECF Nos. 5–8. On April 29, 2021, the Defendant was ordered to show cause as to why an order should not be issued pursuant to Rule 65 of the Federal Rules of Civil Procedure. ECF No. 16. This Court also scheduled a hearing for May 6, 2021. *Id*. During that hearing, this Court denied Plaintiff's motion for a preliminary injunction. *See* Tr. of Hearing, ECF No. 19. On June 30, 2021, Plaintiff filed their Amended Complaint. *See* AC, ECF No. 30. Defendant Simons moved to dismiss the AC on August 6, 2021. ECF No. 34. The Court denied the Defendant's motion on March 29, 2022, ECF No. 39, and on April 4, 2022, this case was referred to Magistrate Judge Sarah L. Cave for general pretrial matters, ECF No. 40.

On December 7, 2022, Plaintiff's counsel advised the Court that discovery was complete and that Defendant would move for summary judgment. ECF No. 51. On December 12, 2022, the Plaintiff wrote a second letter advising that "[u]pon further review, Plaintiff also intends to file a motion for summary judgment." ECF No. 52. On December 29, 2022, the Defendant moved for summary judgment without first moving for a pre-motion conference as is required under this Court's Individual Practices. ECF No. 53. On January 2, 2023, TIAA filed a pre-motion conference letter requesting leave to move for summary judgment. ECF No. 58. Defendant Simons then filed her own pre-motion conference letter requesting leave to move for summary judgment. ECF No.

59. The parties opposed the opposing parties' request. ECF Nos. 60–61. On January 12, 2023, the Court granted the parties' request to move for summary judgment, set a briefing schedule, and denied the Defendant's pending motion for summary judgment with leave to refile in accordance with the Court's schedule. ECF No. 64.

On January 20, 2023, Defendant filed a second pre-motion conference letter requesting leave to move for sanctions against TIAA and its counsel of record. ECF No. 65. Plaintiff opposed Defendant's letter. ECF No. 66. On January 27, 2023, the Court granted Defendant's leave to move for sanctions and set a briefing schedule.

On January 31, 2023, Plaintiff filed its motion for summary judgment, alongside its accompanying memorandum of law and supporting papers. *See* ECF No. 68.[11] On that same day, Defendant filed her motion for summary judgment, ECF No. 69, alongside the accompanying memorandum of law and supporting papers. ECF No 69.[12] The parties filed their oppositions on February 21, 2023. ECF Nos. 71–72.[13] The parties' reply memoranda were filed on March 7, 2023.[14] Defendant moved for sanctions on February 6, 2023. *See* "Rule 11 Mot.", ECF No. 70–71. On February 27, 2023, Plaintiff filed its opposition, "Rule 11 Opp.", ECF No. 73, and on March

---

[11] All citations to Plaintiff's Memorandum of Law in Support of its Motion for Summary Judgment, ECF No. 68-1, will be denoted as "Pl.'s Mot."

[12] All citations to Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, ECF No. 69-1, will be denoted as "Def.'s Mot."

[13] All citations to Defendant's Memorandum of Law in Opposition to Plaintiff's Motion, ECF No. 71, will be denoted as "Def.'s Opp." All citations to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion, ECF No. 72, will be denoted as "Pl.'s Opp."

[14] All citations to Defendant's Reply Memorandum of Law, ECF No. 75, will be denoted as "Def.'s Reply." All citations to Plaintiff's Reply Memorandum of Law, ECF No. 74, will be denoted as "Pl.'s Opp."

10, 2023, Defendant filed her reply memorandum. *See* "Rule 11 Reply", ECF No. 76. The Court deems the motions to be fully briefed.

## LEGAL STANDARD

### I.    Rule 56 Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is appropriate if the evidence in the form of affidavits, deposition transcripts, or other documentation shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). In this context, a court's role "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986).

The moving party has the initial burden "to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994) (citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975)). A fact is "material" when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id*. There is no issue of material fact where the facts are irrelevant to the disposition of the matter. *See Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC*, 967 F. Supp. 2d 756, 761 (S.D.N.Y. 2013); *see also Anderson*, 477 U.S. at 248. Where the moving party satisfies its burden by "demonstrat[ing] the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal citations and quotation marks omitted).

In deciding a summary judgment motion, courts must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Niagara Mohawk Power Corp. v. Jones Chemical Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (citing *Anderson*, 477 U.S. at 255). Courts may not assess credibility, nor may they decide between conflicting versions of events, because those matters are reserved for the jury. *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005). However, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* (quoting *Anderson*, 477 U.S. at 252). "To defeat summary judgment, therefore, nonmoving parties must do more than simply show that there is some metaphysical doubt as to the material facts, and they may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (internal citations and quotation marks omitted).

When considering a motion for summary judgment, a district court "must also be mindful of the underlying standards and burdens of proof . . . because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Maco v. Baldwin Union Free Sch. Dist.*, 249 F. Supp. 3d 674, 678 (E.D.N.Y. 2017) (quoting *SEC v. Meltzer*, 440 F. Supp. 2d 179, 187 (E.D.N.Y. 2006) (internal quotation marks omitted), *aff'd*, 726 F. App'x 37 (2d Cir. 2018)). "Where the non-moving party would bear the ultimate burden of proof on an issue at trial, the burden on the moving party is satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim." *Id.* (quoting *Meltzer*, 440 F. Supp. 2d at 187) (internal quotation marks omitted).

"If there are cross-motions for summary judgment, the Court must assess each of the motions and determine whether either party is entitled to judgment as a matter of law." *Gen. Ins. Co. of Am. v. Starr Indem. & Liab. Co.*, No. 14-CV-7354, 2016 WL 4120635, at *4 (S.D.N.Y. July

20

22, 2016) (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)). "[W]hen both sides move for summary judgment, neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc.*, 996 F.2d at 1461 (citation omitted). Instead, the court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* at 1461 (citation omitted).

## II.    Sanctions

Rule 11 governs motions for frivolous filings. *Robledo v. Bond No. 9*, 965 F. Supp. 2d 470, 477 (S.D.N.Y. 2013). Federal Rule of Civil Procedure 11(b) provides that:

> [b]y presenting to the court a pleading, written motion, or other paper ... an attorney... certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b). "A pleading, motion or other paper violates Rule 11 either when it has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or good faith argument for the extension, modification or reversal of

existing law." *See Kropelnicki v. Siegel*, 290 F.3d 118, 131 (2d Cir. 2002) (internal citations and quotations omitted). The rule imposes on attorneys "an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters.*, 498 U.S. 533, 548, 551 (1991).

The Court may impose sanctions if the attorney responsible for the submission is found to have acted with "objective unreasonableness." *Black v. Ganieva*, No. 21 CIV. 8824 (PAE), 2022 WL 2354916, at *11 (S.D.N.Y. June 30, 2022) (citing *In re Pennie & Edmonds LLP*, 323 F.3d 86, 90 (2d Cir. 2003) and *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 150 (2d Cir. 2009). Moreover, Rule 11 is implicated "where an attorney or party declines to withdraw a claim upon an express request by his or her adversary after learning that the claim [is] groundless." *Azuike v. BNY Mellon*, 962 F. Supp. 2d 591, 957 (S.D.N.Y. 2013).

However, "courts impose Rule 11 sanctions with discretion and caution." *Robledo*, 965 F. Supp. 2d at 478 (citing *Caisse Nationale de Credit Agricole–CNCA v. Valcorp.*, 28 F.3d 259, 264 (2d Cir.1994)). Indeed, "the Second Circuit has instructed that 'sanctions may not be imposed unless a particular allegation is utterly lacking in factual support.'" *New V & J Produce Corp. v. NYCCaterers Inc.*, No. 13 CIV. 4861 ER, 2014 WL 5026157, at *5 (S.D.N.Y. Sept. 29, 2014) (quoting *O'Brien v. Alexander*, 101 F.3d 1479, 1489 (2d Cir. 1996).

## DISCUSSION

In her motion for summary judgment, Defendant argues that (i) TIAA has failed to produce any evidence supporting a breach of contract and (ii) in any event, the non-solicitation covenants contained in the 2015 Agreement and the VSP Agreement are overbroad and unenforceable as a matter of law. *See* Def.'s Mot. On the other hand, in its motion, Plaintiff argues that (i) the non-

solicitation covenants are enforceable; (ii) Defendant violated her covenants to not to solicit employees to depart TIAA and (iii) Defendant violated her VSP agreement to not solicit clients. *See* Pl.'s Mot.[15]

**Breach of Contract:** To make out a claim for breach of contract under New York law, a plaintiff must show "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). "Plaintiffs bear the burden of proof as to all elements of a breach of contract claim." *Choquette v. Motor Information Systems, Inc.*, No. 15-CV-9338, 2017 WL 3309730, at *3 (S.D.N.Y. Aug. 2, 2017).

### A. Defendant's Motion for Summary Judgment (Breach of Contract: Non-Solicitation Covenant)

Defendant asks the Court to find that the undisputed facts demonstrate that Plaintiff TIAA has not asserted a cognizable claim for breach of contract under New York law. Def.'s Mot. at 1. However, with the factual record before it, the Court cannot make such a finding. Defendant has failed to show there are no genuine issues of material fact in dispute as to Plaintiff's claim for breach of contract for Defendant's alleged violation of the non-solicitation covenant.

Under the VSP Agreement's non-solicitation covenant, Defendant Simons could not "solicit, recruit, induce, urge, or encourage, or attempt to solicit, recruit, induce, urge, or encourage, any employee . . . to terminate, cancel, withdraw or reduce its relationship with TIAA…" VSP Agreement ¶ (8)(b)(ii)(A). Simons also agreed to a similar non-solicitation covenant in 2015. Thus, to establish a breach of contract in violation of these agreements, TIAA

---

[15] Plaintiff ostensibly attempts to add a new claim for breach of contract against Defendant. As discussed further below, the Court will not address this claim because it was not pleaded in Plaintiff's Amended Complaint. Instead, Plaintiff may move for leave to amend its amended complaint.

must establish that Simons solicited, recruited, induced, urged, or encouraged Falter, Doll, and/or

Massie, or any other TIAA employee, to resign from TIAA. *See* Def.'s Mot. at 4. Defendant has

failed to show the absence of a genuine dispute as to whether Simons encouraged or attempted to

encourage Falter, Doll, and/or Massie to resign from TIAA. Particularly, whether Falter, Doll, and

Massie decided to leave TIAA before they asked Simons to join their venture or after she made

concerted steps to develop the venture is a material fact. Plaintiff has shown there is a genuine

dispute as to when exactly Falter, Doll, and Massie decided to leave TIAA's employment. A

reasonable jury or fact-finder could find, for example, that the three were planning to leave, but

open to staying at TIAA, and thereby return a verdict for Plaintiff, ultimately finding that Simons

did encourage or attempt to encourage them to leave, in violation of the VSP Agreement.

In support of her motion for summary judgment, Defendant offers her own sworn

declaration, as well as sworn declarations from Falter, Doll, and Massie—the three individuals

formerly employed by TIAA allegedly solicited by her. Falter, Doll, and Massie state that

Defendant Simons did not solicit them to resign from or otherwise separate from their employment

at TIAA, that the decision to resign from TIAA was theirs and theirs alone, that Simons did not

encourage persuade, or otherwise influence their decision in anyway, and that they would have

resigned from TIAA even if they had no discussions with Simons after she separated from TIAA

in November 2020. *See* Falter Decl.; Doll Decl.; Massie Decl. Falter, Doll, and Massie each

testified in depositions that Simons did not solicit them, and  Falter testified that he and Doll were

actually "recruiting" Simons to join them. Falter Dep. at 46:5-21; 65:12-23.

The factual record shows that after TIAA announced the VSP in May 2020, Falter, Doll,

and Massie seriously discussed leaving TIAA and took tangible steps to leave TIAA and create

their own company. SUMF ¶ 14. They met with vendors and other potential business partners,

24

including Louis Diamond of Diamond Consultants, Raymond James, Charles Schwab, Mariner, Stratos Wealth, Summit Financial, Commonwealth Financial, and Goss Financial Advisors; Defendant Simons was completely unaware of and uninvolved in each of those meetings. *Id*. ¶¶ 15–30. Instead, Simons applied for an open position at TIAA, which she was ultimately rejected from, and from August to mid-November, Simons had multiple rounds of interviews and meetings with Mercer to become a Regional Director. SUMF ¶¶ 36, 37, 45.

After Simons left TIAA and upon learning that Falter's father had suffered from a stroke, Simons called Falter. SUMF ¶ 48. Falter returned her call and after they finished discussing his father's health, he approached her about the new business he was forming with Doll and Massie. *Id*. ¶ 49. Once Simons accepted the team's offer to join and become CEO, she became responsible for "identifying just about anything that needed to happen in order to get the business started." *Id*. ¶ 123; Simons Dep. at 58:9-14. Additionally, it is an undisputed fact that Simons had no confidential information after her employment ended. SUMF ¶ 86.

In opposition Plaintiff points to the deposition testimony of Simons, Falter, Doll, and Massie, and the declaration of Jill Popovich—TIAA's senior managing director responsible for managing the region in which Simons was formerly employed. Popovich Decl. ¶ 1. Plaintiff argues that Doll and Falter made their "final choice as to whether to stay at TIAA or resign" on February 26, 2021—the day they resigned. *See* Pl.'s SUMF ¶¶ 116–117.Construing this factual ambiguity in Plaintiff's favor, the Court finds this is a material fact. Even though the factual record demonstrates that Falter, Doll, and Massie began making preparations to leave TIAA months before they asked Simons to join their new venture in November 2020, *see* SUMF ¶ 14–30, it is unclear how definitive their plans were and whether Simons' actions swayed their eventual decision to leave in February 2021.

25

Additionally, the Court agrees with TIAA that Simons' multiple communications with Falter, Doll, and Massie before they resigned about forming ReFrame, her interfacing with vendors, sending out a "to do list",  and "identifying just about anything that needed to happen in order to get the business started," SUMF ¶ 123, may constitute encouragement or attempted encouragement in violation of the non-solicitation covenant. *See* Pl.'s Opp. at 9. A reasonable jury or fact-finder could find that absent Defendant's active encouragement over a nearly three-month period, one or more of the TIAA employees who joined her at ReFrame very well may have remained with the company and ReFrame may never have been formed. *Id*.

Alternatively, Defendant argues that the non-solicitation covenants contained in the 2015 Agreement and the VSP Agreement are overbroad and unenforceable as a matter of law. *See* Def.'s Mot.

"New York courts have generally concluded that restrictive covenants in employment contracts—such as non-compete, non-solicitation, and non-recruitment clauses—must be subjected to heightened judicial scrutiny since they potentially impinge on individual agency and an employee's ability to make a living." *Oliver Wyman, Inc. v. Eielson*, No. 15-CV-5305 (RJS), 2017 WL 4403312, at *5 (S.D.N.Y. Sept. 29, 2017). However, as explained in this Court's opinion denying Defendant's motion to dismiss, "the Second Circuit has acknowledged an exception to this reasonableness inquiry under the employee choice doctrine, whereby 'New York courts will enforce a restrictive covenant without regard to its reasonableness if the employee has been afforded the choice between not competing (and thereby preserving his benefits) or competing (and thereby risking forfeiture).'" *Int'l Bus. Machines Corp. v. Mueller*, No. 14-CV-9221 (KMK), 2017 WL 4326114, at *7 (S.D.N.Y. Sept. 27, 2017) (quoting *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002)). The employer cannot invoke the employee choice doctrine if

"the employer failed to display a 'continued willingness to employ the party'" subject to the covenant or if "the employee was 'involuntarily discharged without cause.'" *Id.* (quoting *Lucente*, 310 F.3d at 254). Finally, "the factual determination whether an employee was involuntarily terminated is generally not appropriate for summary judgment." *Lucente*, 310 F.3d at 255.

Here, Defendant argues TIAA cannot invoke the employee choice doctrine because it failed to display a "continued willingness to employ" Simons. *See* Reply at 7 (citing *Lucente*, 310 F.3d at 254–55). Defendant asserts that Simons entered into the VSP after TIAA "eliminated her job and then rejected her application for a commensurate position, leaving her with no job at TIAA." *See* Def.'s Opp. at 10. However, TIAA contends that Simons was offered the opportunity to apply to other open equivalent positions at TIAA, but that she instead elected to sign the VSP agreement and part ways with the company. Pl.s' Opp. at 22. Plaintiff's continued willingness to employ Simons and whether Simons was involuntarily dismissed from TIAA are both inappropriate factual determinations for this stage of the litigation. *See Lucente*, 301 F.3d at 254 ("[T]he factual determination whether an employee was involuntarily terminated is generally not appropriate for summary judgment.").

Accordingly, Defendant's motion for summary judgment is **DENIED**.

## B.   Plaintiff's Motion for Summary Judgment (Breach of Contract: Non-Solicitation Covenant)

In the present case, as to the only claim of the Amended Complaint for breach of contract, this Court has already considered in depth the undisputed facts in the parties' affidavits and submissions and determined that there exists a genuine issue of material fact as to whether Defendant encouraged or attempted to encourage her former colleagues to depart TIAA in violation of the VSP Agreement. Therefore, based on the factual record before it, the Court finds that a reasonable jury or fact-finder could return a verdict in favor of Defendant or Plaintiff.   As

such, this Court need not reconsider the facts to construe them in Defendant's favor. Thus, Plaintiff's motion for summary judgment is also **DENIED.**

### III.    Defendant's Request to Amend the Complaint

In their motion for summary judgment, Plaintiff argues that the Defendant violated her VSP Agreement covenant to not divert clients. Pls' Mot. at 13. The VSP Agreement contained a clause whereby Defendant promised following the termination of her employment to "not solicit, divert, take away, or attempt to solicit, divert, or take away (through any form of contact or communication whether or not initiated by you for such purpose) any Client, with whom or which you had Material Contact, for the purpose of having such Client terminate, cancel, withdraw, reduce, diminish, or limit, in any manner, the Client's relationship with TIAA." VSP Agreement at ¶ (8)(b)(ii)(C). TIAA contends that Defendant asked Massie if there were any "announcement" calls he could make to TIAA clients, and that in response, Massie placed a "handful of announcement calls" to TIAA clients. Pl.'s SUMF ¶¶ 149, 142. Defendant disputes this factual assertion.

TIAA argues that the Amended Complaint contains allegations that covers this client diversion claim. *See* Pl.'s Mot. at 13.[16] This Court disagrees. The specific allegation that Simons had solicited TIAA *clients* in violation of the VSP agreement is nowhere to be found in the AC. In the AC, under the heading "Count I-Breach of Contract", Plaintiff specifically refers only to the "covenants not to solicit co-employees." AC ¶ 43. In the parties' Report of Rule 26(f) Conference

---

[16] Specifically, Plaintiff points out that (i) the AC specifically alleges that Defendant agreed to "other covenants" in the VSP Agreement, AC ¶¶ 98 and 101; (ii) the AC further alleges that Defendant's receipt of the over $500,000 paid to her is in return for "observing its terms," *id*. ¶ 103; and (iii) that the AC also emphasizes that the over $500,000 TIAA paid to Defendant under the VSP Agreement "is conditioned on you [Defendant] complying with all of the requirements." *Id*. ¶ 13.

and Case Management Plan, the Plaintiff stated that "[TIAA] alleges that [Simons] breached her covenant under the [VSP] agreement not to solicit employees", ECF No. 44 at § 3, and that discovery was needed "on Defendant's solicitation of Plaintiff's employees." *Id*. at § 4.  Therefore, the non-client diversion covenant does not appear to have been the subject of discovery. After discovery closed, Plaintiff did not notify the Court or the Defendant that it wished to bring this claim or amend its Amended Complaint. Additionally, Defendants did not mention this claim in their pre-motion conference letter setting forth its basis for moving for summary judgment. *See* ECF No. 58. The Court finds that this new breach of contract claim has not been pleaded by Plaintiff. Therefore, the Court will not address this new claim in resolving the parties' summary judgment motions.

Alternatively, Plaintiff argues that it is entitled to amend its AC. Pl.'s Reply at 14 n.1. Defendant argues that TIAA should not, at this late stage in the litigation, be permitted to add this additional claim "seemingly out of nowhere." Def.'s Opp. at 19. Defendant asserts there is no basis for permitting TIAA to amend its complaint again because there are no facts here to support another amendment and because an amendment would unfairly prejudice Simons by subjecting her to "additional and entirely unnecessary attorney fees." Def.'s Reply at 8. Plaintiff explains that it "did not specifically allege this breach in the Amended Complaint only because it did not learn of it until *months later* when it deposed Massie." Pl.'s Reply at 8.

Plaintiff may move for leave to amend the AC.[17] The Court will hold a telephonic conference on **October 11, 2023** to discuss the timing of Plaintiff's amendment.

---

[17] The Court notes that, based on the current factual record before the Court, there also appears to be a genuine dispute as to whether Simons encouraged Massie to contact former clients. It is likely that a reasonable jury or fact-finder could return a verdict in favor of either party on a claim based on Defendant's alleged violation of the covenant to not divert clients.

## IV.     Sanctions

In her letter requesting leave to move for sanctions, Defendant explained that "sanctions are warranted in this case because TIAA has relentlessly pursued a frivolous breach of contract claim against Simons . . . when it knew that it had no credible facts to support its theory that Simons solicited three other former TIAA employees to resign from the company." ECF No. 65. In her motion, Defendant specifically argues that (i) Rule 11 sanctions should be imposed because TIAA has known from the outset of this case that it had no admissible evidence to support a breach of contract claim against Defendant and (ii) TIAA should also be sanctioned for failing to withdraw the Amended Complaint when discovery confirmed the lack of evidentiary support. *See* Rule 11 Mot.

First, Defendant contends that "even before the filing of legal paper, [her counsel] explained that she did not solicit any TIAA employees" and that "the evidence TIAA was relying on was speculative." *Id*. at 5. She explains that she offered to provide a sworn affidavit attesting to the fact that she never solicited any TIAA employees. *Id*. Simons also offered to coordinate sworn affidavits from the individuals whom TIAA believed she solicited. *Id*. Defendant, therefore, argues that in filing TIAA's original complaint, counsel for TIAA violated Rule 11's protections by filing a pleading without conducting a reasonable inquiry into whether the factual allegations were supported by evidence. *Id*. (citing *Bus. Guides, Inc.*, 498 U.S. at 548, 551). Defendant ultimately filed the sworn declarations during the briefing on TIAA's motions for a preliminary injunction. *See* ECF No. 17. However, Defendant asserts that TIAA was "undeterred by this sworn testimony" and presented the Court with an Amended Complaint to add "one additional allegation 'upon information and belief' that Simons solicited Falter by initiating a communication with him a few days after she signed her non-solicitation agreement." *Id*. at 6 (quoting AC ¶ 31).

Second, Defendant argues that TIAA produced no evidentiary support for its allegations either in response to Simons' discovery requests or through depositions. In support of her argument here, Defendant essentially retells the factual assertions in her motion for summary judgment and her Rule 56.1 statement. Defendant asked TIAA to withdraw its Amended Complaint in August 2022 and at the close of discovery in November 2022. Rule 11 Mot. at 7. However, TIAA refused. *Id*. According to Defendant, TIAA and its counsel had an obligation under Rule 11 to withdraw the Amended Complaint because it knew then—if not earlier—that its allegation on the single dispositive issue in the case was "utterly lacking in support." *Id*. at 8. *(*quoting *Galin v. Hamada,* 283 F. Supp. 3d 189, 203 (S.D.N.Y. 2017).

"The Supreme Court has cautioned that Rule 11 'must be read in light of concerns that it will . . . chill vigorous advocacy.'" *GemShares, LLC v. Kinney*, No. 17 CIV. 844 (CM), 2017 WL 1092051, at *1 (S.D.N.Y. Mar. 15, 2017) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990)). And the Second Circuit has "repeatedly held, [that] Rule 11 'is targeted at situations where it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands.'" *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1993) (quoting *Associated Indem. Corp. v. Fairchild Indus.*, 961 F.2d 32, 34 (2d Cir. 1992). Given the Second Circuit's instruction to grant Rule 11 sanctions "with caution," *Robledo*, 965 F. Supp. 2d at 478, and, further, to "resolve all doubts in favor of the party against whom sanctions are sought," Simons' motion for sanctions is denied. *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, No. 1:15-CV-2457-GHW, 2019 WL 1245013, at *6 (S.D.N.Y. Mar. 18, 2019), *aff'd*, 850 F. App'x 38 (2d Cir. 2021) (quoting *Rodick*, F.3d at 1350.

31

Although this Court has denied Plaintiff's motion for summary judgment, Plaintiff did make meritorious arguments in opposition to Defendant's motion for summary judgment. Therefore, it cannot be said that Plaintiff's allegation on the single claim in this case was " utterly lacking in support." *See Galin,* 283 F. Supp. 3d at 203. Defendant has not met the high threshold for sanctions. Moreover, as Plaintiff points out, before it filed its complaint, it did engage in an inquiry of its claim by reaching out to Defendant for a "satisfactory explanation" as to the simultaneous departures of Falter, Doll, and Massie and their roles as co-founders with Defendant of ReFrame. Rule 11 Op. at 9.  Additionally, this Court previously denied Defendant's motion to dismiss finding that the Plaintiff's allegations were plausible at that stage of the litigation. ECF No. 39. Finally, it is within this Court's discretion to impose sanctions and this Court declines to do so. Defendant's motion for sanctions is **DENIED.**

## CONCLUSION

For the foregoing reasons, Defendant's motion for sanctions is **DENIED**, Plaintiff's motion for summary judgment is **DENIED,** and Defendant's motion for summary judgment is **DENIED**. Additionally, Plaintiff may move for leave to amend its Amended Complaint. The Court will hold a telephonic conference on **October 11, 2023 at 11:30 AM Eastern** Time to discuss the timing of Plaintiff's amendment and next steps in this matter. All parties shall appear and should contact the Court at **1-888-363-4749 (access code: 3768660).**  The Clerk of the Court is respectfully directed to terminate the open motions at ECF Nos. 68, 69, and 70.

**SO ORDERED.**

Dated:    **September 29, 2023**
           **New York, New York**

_____
          **ANDREW L. CARTER, JR.**
          **United States District Judge**